IN THE CIRCUIT COURT OF CRAIGHEAD COUNTY, ARKANSAS
CIVIL DIVISION

SUE GARRISON, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED                                                  **PLAINTIFF**

VS.                              NO. CV - 2016 - 601 (JF)

REVCLAIMS, LLC; AVECTUS
HEALTHCARE SOLUTIONS, LLC;
ST. BERNARD'S HOSPITAL, INC;
ST. BERNARD'S COMMUNITY
HOSPITAL CORPORATION; SHELBY
COUNTY HEALTHCARE CORPORATION
d/b/a REGIONAL MEDICAL CENTER and
d/b/a REGIONAL ONE HEALTH;
BAPTIST HEALTH; BAPTIST HEALTH
HOSPITALS; LAWRENCE MEMORIAL
HOSPITAL; WHITE RIVER HEALTH
SYSTEM, INC.; and JOHN DOES 1-100                          **DEFENDANTS**

## CLASS ACTION COMPLAINT

Comes now Plaintiff, Sue Garrison, Individually and on Behalf of All Others

Similarly Situated, by and through her undersigned attorneys, Wilcox & Lacy, PLC and

Jeff Scriber, P.A., and for their Class Action Complaint against Defendants, RevClaims,

LLC, Avectus Healthcare Solutions, LLC , St. Bernard's Hospital, Inc., St. Bernard's

Community Hospital, Inc., Shelby County Healthcare Corporation d/b/a Regional

Medical Center and d/b/a Regional One Health, Baptist Health, Baptist Health Hospitals,

Lawrence Memorial Hospital, White River Health System, Inc., and John Does 1-100,

states and alleges the following:

1

EXHIBIT "D"

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is an individual resident of Craighead County, Arkansas.

2.      Defendant RevClaims, LLC (hereinafter "RevClaims") is a foreign limited liability company with a principal place of business in a state other than Arkansas. RevClaims's registered agent for service of legal process is The Corporation Company, 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201.

3.      Defendant Avectus Healthcare Solutions, LLC (hereinafter "Avectus") is a foreign limited liability company with a principal place of business in a state other than Arkansas.  Avectus's registered agent for service of legal process is CT Corporation, 645 Lakeland Drive East, Suite 101, Flowood, Mississippi 39232.

4.      Defendant St. Bernard's Hospital, Inc. (hereinafter "St. Bernard's") is an Arkansas corporation with a principal place of business in Arkansas.  St. Bernard's registered agent for service of legal process is Ralph W. Waddell, 225 East Jackson, Jonesboro, AR 72401.

5.      Defendant St. Bernard's Community Hospital, Inc. (hereinafter "CrossRidge") is an Arkansas corporation with a principal place of business in Arkansas. CrossRidge's registered agent for service of legal process is Ralph Waddell, 310 South Falls Blvd., Wynne, AR 72396.

6.      Defendant Shelby County Healthcare Corporation d/b/a Regional Medical Center and d/b/a Regional One Health (hereinafter "The Med") is a foreign corporation with a principal place of business in a state other than Arkansas.  The Med's registered

agent for service of legal process is Monica Wharton, 877 Jefferson Avenue, Memphis, Tennessee 38103.

7.      Defendant Baptist Health is an Arkansas corporation with a principal place of business in Arkansas.  Baptist Health's registered agent for service of legal process is Troy Wells, 9601 Baptist Health Drive, Little Rock, AR 72205.

8.      Defendant Baptist Health Hospital is an Arkansas corporation with a principal place of business in Arkansas.  Baptist Health Hospital's registered agent for service of legal process is Troy Wells, 9601 Baptist Health Drive, Little Rock, AR 72205.

9.      Baptist Health and Baptist Health Hospitals are collectively referred to herein as "Baptist."

10.      Defendant Lawrence Memorial Hospital is a hospital located in Walnut Ridge, Arkansas that is wholly owned by Lawrence County, but is operated and controlled through an operating agreement with one or both St. Bernard's entities named as Defendants herein.

11.      Defendant White River Health System, Inc. is an Arkansas corporation with a principal place of business in Arkansas.  White River Health System, Inc.'s registered agent for service of legal process is Gary Bebow, 1710 Harrison Street, Batesville, AR 72501.

12.      Defendants John Does 1-100 are hospitals, medical centers and clinics, physician groups, nursing homes, residential care facilities, assisted living centers, physicians, and any other medical care providers doing business in the state of Arkansas

3

which have a Provider Agreement for a Qualified Health Plan ("QHP") with Arkansas

Blue Cross Blue Shield, Celtic Insurance Company (Ambetter), QualChoice/QCA Health

Plan ("QualChoice"), and/or United Healthcare for reimbursement for covered services

for plan enrollees, and on whose behalf RevClaims and/or Avectus have performed

services as a collection agent that has resulted in bills and or liens for services provided to

patients with QHPs being submitted to and/or collected from the patient directly in lieu of

seeking reimbursement from the QHP. The identities of all such individuals and/or

entities are unknown at this time. Pursuant to Ark. Code Ann. § 16-56-125 and the

Affidavit attached hereto as Exhibit 1, when the identity of these individuals or entities is

discovered, this pleading will be appropriately amended.

13.     St. Bernard's, CrossRidge, Baptist, White River Health Systems, Lawrence

Memorial, and John Does 1-100 are collectively referred to herein as "Defendant

healthcare providers."

14.     This Court has subject matter jurisdiction over this action due to the amount

and type of relief sought and because the amount in controversy exceeds the minimum

jurisdictional limits of this Court.

15.     This Court has personal jurisdiction over the Defendants pursuant to Ark.

Code Ann. § 16-4-101 as all Defendants have had more than minimum contacts with the

State of Arkansas and have availed themselves of the privilege of conducting in business

in this State. In addition, as explained below, Defendants have committed affirmative

acts within the State of Arkansas which give rise to civil liability.

4

16.     Venue is appropriate in this forum pursuant to Ark. Code Ann. § 16-55-213 because of the residence of the Plaintiff and because the substantial part of the events giving rise to the Plaintiff's claims occurred in this county.

GENERAL ALLEGATIONS

A. Sue Garrison's Motor Vehicle Collision

17.     Sue Garrison was involved in a motor vehicle collision in Craighead County, Arkansas on August 22, 2013. The driver of the at-fault vehicle, Austin Aquino, was a resident of the State of Arkansas.

18.     Sue Garrison suffered, *inter alia,* blunt force trauma and severe orthopedic injuries in the collision. At the direction of law enforcement and the emergency personnel at the scene, Ms. Garrison was transported to NEA Baptist Memorial Hospital for evaluation and treatment of her injuries.

19.     After receiving emergency inpatient care from NEA Baptist Memorial Hospital, Ms. Garrison received significant care from St. Vincent's Infirmary where, after ongoing treatment for approximately one year, she underwent multiple surgeries that included the removal and replacement of an artificial knee joint that was injured during the collision. She was referred to St. Bernard's for physical therapy after her final surgery.

20.     Sue Garrison was, at all times relevant to this suit, enrolled in a Qualified Health Plan ("QHP") with Arkansas Blue Cross Blue Shield (hereinafter "BCBS"), offered under the Arkansas health insurance exchange. A copy of her enrollment verification is attached hereto as Exhibit 2.

5

21.     Upon admission to St. Bernard's, and as a condition of Sue Garrison's admission to St. Bernard's, St. Bernard's was assigned all rights belonging to Ms. Garrison as an Arkansas Medicaid beneficiary.  This included an assignment of benefits authorizing St. Bernard's to bill BCBS directly and to receive direct reimbursement from BCBS for medical services provided to Ms. Garrison.  *See* Exhibit 3.  Defendants CrossRidge, Baptist, Lawrence Memorial, and White River Health Systems each require that patients in the Class execute substantially identical assignments of rights upon admission.  *See e.g.,* Exhibit 4.

22.     The "standard" charges for the treatment provided to Sue Garrison at St. Bernard's, without reducing the amount as required by St. Bernard's contract with Arkansas BCBS, totaled $2,010.00.

23.     St. Bernard's contracted with RevClaims for the collection of this account.

24.     Following her release from treatment, Sue Garrison pursued a claim against the at-fault driver responsible for the motor vehicle collision, and her liability insurer, Nationwide.

25.     St. Bernard's and RevClaims filed and asserted a lien for the full amount of its bill, $2,010.00, and notified Sue Garrison, through her counsel, of their intent to assert the lien against Ms. Garrison.  St. Bernard's did not bill these services to Arkansas BCBS for payment.

26.     St. Bernard's was advised that Sue Garrison is insured with BCBS and was instructed to bill BCBS for reimbursement for the medical services provided.  *See* Exhibit 5.

6

27.     In response, RevClaims refused to bill Blue Cross Blue Shield for this treatment, and insisted upon filing a lien on Ms. Garrison's third-party claim against the tortfeasor instead.  *See* Exhibit 6.

**B.  RevClaims's and Avectus' Collection Efforts Throughout The State Of Arkansas On Behalf of Defendant Healthcare Providers**

28.     RevClaims and Avectus are nationwide collection agencies for hospitals and health systems, community hospitals, and trauma centers which claim to assist these medical care providers in boosting revenue and reducing accounts receivable days by increasing injury claims recoveries.  RevClaims and/or Avectus have been hired by each of the Defendant medical care providers herein for that precise purpose.

29.     To perform these services, RevClaims and Avectus hold themselves out as having a staff team that includes attorneys and paralegals who understand the nuances of state and federal law, file appropriate liens, and negotiate on clients' behalf.  They likewise hold themselves out as having on staff insurance professionals and compliance professionals who understand the intricacies of third-party reimbursement and ensure that its clients are compliant with Medicare, Medicaid, Affordable Care Act, and other various State and federal regulations.

30.     RevClaims, for example, boasts of having an 86% recovery rate for its clients for charges for which liens are filed.

31.     RevClaims's and Avectus's collection procedures specifically target victims of automobile collisions and other victims of personal injuries for which third-parties are liable.  Due to the existence of potential third-party payor sources, such

7

victims are lucrative sources for collections, as RevClaims, Avectus, and the providers on whose behalves they are acting can collect funds which far exceed the providers' regular negotiated reimbursement rates.

32.     The overwhelming majority of healthcare providers' collections are from health insurance networks, QHPs, Medicare, or Medicaid. All of these sources have contractually negotiated rates for services, and, regardless of the source, the contractually negotiated rate is far below the "standard" charge for services provided.

33.     Consequently, in an effort to boost collections, RevClaims and Avectus target patients for whom third-party payor sources are available, in order to collect the "standard"—or inflated—bill for the exact same services which would lead to a greatly reduced payment if the bill were submitted to the insurer, Medicare, or Medicaid for payment.

34.     For purposes of this lawsuit, this practice of attempting to collect the "standard"—or inflated—bill for services for which a reduced payment could be collected from an in-network insurer, Medicare, or Medicaid, is known as "balance billing" or "substituted billing." Under Arkansas and federal law, this practice is illegal.

### C. Qualified Health Plans Under The Arkansas Health Insurance Exchange

35.     Under the Affordable Care Act ("ACA"), all health plans sold both inside and outside of Federal or State exchanges must meet certain guidelines: 1) they must be "guaranteed issued," which refers to the designated requirement of insurance coverage that is guaranteed to be issued to applicants regardless of their health status, age, or income, and must guarantee that the policy will be renewed as long as the policyholder

continues to pay the policy premium;  2) they must follow the ACA's cost/sharing guidelines; and 3) they must cover "essential health benefits" with no lifetime or annual maximums.

36.     In order to be ACA-compliant, a health plan must also be certified by the Arkansas Insurance Department and the U.S. Department of Health and Human Services as a "qualified health plan" (QHP).  Certification ensures that all plans offered by the insurer contain ACA's minimum requirements.

37.     Although the "QHP" label is basically an extra layer of consumer protection that makes shopping on the exchanges a good idea even for people who do not qualify for subsidies, all plans from the spring of 2013 forward must meet the same basic policy guidelines.  All plans offered on the exchanges must be approved QHPs.  As a practical matter, all plans in Arkansas issued by a QHP insurer contain identical QHP provisions, unless the plan pre-dated the ACA and was grandfathered in pursuant to the terms of the ACA.

38.     In the spring of 2013, health insurance carriers in each state submitted plan designs and pricing to the exchanges which were approved and considered QHPs.

39.     All QHPs offer the same core set of benefits, including preventive services, mental health and substance abuse services, emergency services, prescription drugs, and hospitalization.

40.     QHPs are qualified and labeled by a standard coverage level to help consumers compare plans "apples to apples."  The four standard coverage levels ("metallic tiers") are:

9

a)      Bronze:  the plan must cover 60% of expected costs for the average individual;

b)      Silver:  the plan must cover 70% of expected costs for the average individual;

c)      Gold: the plan must cover 80% of expected costs for the average individual; and

d)      Platinum:  the plan must cover 90% of expected costs for the average individual.

41.      There are also catastrophic plans.  Catastrophic plans have a high deductible and offer less coverage that the metallic tiered plans.

42.      In order to comply with the ACA's mandate, the Arkansas Insurance Department received grant money in February of 2012 to develop a partnership exchange.

43.      Arkansas was the first state to receive federal approval to expand Medicaid through the private option.  Through the private option, the State uses money earmarked through the ACA for Medicaid expansion to subsidize the purchase of private insurance.

44.      Sign-ups for QHPs in Arkansas totaled 43,446 during the 2014 open enrollment.

45.      As originally constructed, the private option required authorization by the Arkansas legislature.  In late February 2014, the private option was reauthorized.

46.      Again in 2015, the private option was funded in its current form through the end of 2016.

47.      Under the current version of the Medicaid expansion in Arkansas, eligible enrollees with household income up to 138% of the poverty level are enrolled in private

health insurance plans through the exchange, but with premiums partially or fully subsidized by Medicaid funds.

48.     65,684 additional Arkansas residents signed up for health insurance through the Arkansas exchange between November 15, 2014 and February 22, 2015, according to the U.S. Department of Health and Human Services.

49.     The following health insurance carriers have all offered insurance plans since the implementation of the partnership exchange in Arkansas:  Arkansas Blue Cross Blue Shield, Celtic Insurance Company (Ambetter), QualChoice/QCA health plan (collectively referred to hereafter as "QualChoice"), and United Healthcare of Arkansas.

50.     In order for the above insurers to obtain approval as a qualified health plan for purposes of participating in the market exchange, each insurer must submit each version of its metallic tiered plans and catastrophic plan to the Arkansas Insurance Department for review and approval.  Once approved by the Arkansas Insurance Department, they are then submitted to the U.S. Department of Health and Human Services for approval.  Thus, each plan must contain identical provisions regarding the ACA's requirements.

51.     For insurance plans already in place in Arkansas prior to the passage of the ACA, most of these plans were "grandfathered in" under the Affordable Care Act's provisions.  However, for all other plans and policies issued in the State of Arkansas since the effective date of the Affordable Care Act and the establishment of Arkansas' partnership exchange, these policies must include coverage and provisions as mandated by the Affordable Care Act.

52.     Thus, the QHP is offered in identical forms under three different scenarios. First, if a person is eligible for traditional Medicaid, he or she will be enrolled in a QHP with no responsibility for premium payments under Medicaid's traditional structure. Second, for individuals not meeting the traditional Medicaid income eligibility threshold, but whose income does not exceed 138% of the State's poverty level, these individuals may obtain coverage under a QHP under Arkansas' private option marketplace, which qualifies them for subsidies for partial premium payments in the form of rebates and/or tax credits. Finally, for individuals who exceed the private option's income limitations, they may simply purchase the QHP's on their own either through the partnership exchange's website or directly from any of the QHP insurers.

53.     One requirement of a QHP Plan is a prohibition on "balance billing" or "substituted billing." "Balance billing" or "substituted billing" is a practice of attempting to collect the "standard – or inflated – bill for covered services provided to insured patients."

54.     The Blue Cross Blue Shield provider manual, for example, states "you are not permitted to 'balance bill' for amounts in excess of the Arkansas Blue Cross Blue Shield (member copayment, coinsurance, and deductible are deemed part of the allowance for this purpose, and should be billed to the member)." *See* Exhibit 7.

55.     A separate provision states "as required by our provider participation agreements, providers should always bill and collect all copayments, coinsurance, and deductibles directly from the member. As the provider looks solely to Arkansas Blue Cross Blue Shield for payment of <u>covered services</u>, providers should not bill or collect in

12

amount in excess of the Arkansas Blue Cross payment except for the applicable copayments, coinsurance, and deductibles." In fact, this provision goes on to prohibit providers from collecting any amount for services not deemed meeting the primary coverage criteria if and only if the provider obtains a written statement from the member before any services are provided, acknowledging that the services are not covered by the member's health plan or contract, and specifying the amount of charges for those services.

56.     The Blue Cross Blue Shield Provider Agreement further states "providers are not permitted to 'balance bill' a member for amounts in excess of the Arkansas Blue Cross Blue Shield allowance (member copayment, coinsurance, and deductible are deemed part of the allowance for this purpose, and should be billed to the member) for covered services."

57.     Likewise, the Ambetter Provider Agreement, as well as provider and billing manual, specifically states "Ambetter providers are prohibited from billing the member for any covered services except for copayments, coinsurance, and deductibles." Further, "if the amount collected from the members is higher than the actual amount owed upon claim adjudication, the provider must reimburse the member the overpaid amount within 45 days." See Exhibit 8.

58.     Under a separate provision entitled "no balance billing," the manual states "payments made by Ambetter to providers less any copays, coinsurance, or deductibles, which are the financial responsibility of the member, will be considered payment in full.

13

That is, providers may not seek payment from Ambetter members for the difference between the billed charges and the contracted rate paid by Ambetter." *See Id.*

59.    QualChoice's Provider Agreement likewise contains a prohibition on balance billing, stating "network providers are prohibited by contract from billing the member above and beyond their normal copayment, coinsurance, and deductible. Arkansas State law also prohibits providers who are contracted with a Health Maintenance Organization from billing a member of the Health Maintenance Organization above and beyond their normal copayment, coinsurance, and deductible." *See* Exhibit 9.

60.    The QualChoice Provider Manual states "network providers shall not bill, charge, collect a deposit from, or seek compensation, remuneration, or reimbursement from, or have any recourse against any member or person other than QualChoice for Covered Medical Services."

61.    To the extent any of the Defendants rely upon any State law or common law inconsistent with the requirements of the Arkansas statutes and Federal statutes and regulations cited above enacting the ACA program, such law is preempted by Federal law. *See e.g. Abbott v. Banner Health Network*, 341 P.3d 478 (2014); *see also Spectrum Health*, 410 F.3d 304 (6th Cir. 2005); *Miller v. Gorski Waldyslaw Estate*, 547 F.3d 273 (5th Cir. 2008).

62.    Defendant healthcare providers, as well as their subsidiaries and affiliates, have each entered into contracts to participate as providers with QHP insurers in which they have agreed to comply with the applicable Arkansas and ACA statutes with respect

to ensuring that participants and beneficiaries are not billed directly for covered services and that the participants and beneficiaries are not charged in excess of the rate agreed to by the QHP insurers (Arkansas Blue Cross Blue Shield, Ambetter, QualChoice, and United Healthcare) for the medical services provided.

63.     As administered in Arkansas, the ACA, provider agreements, and provider manuals implement a system whereby medical care providers such as Defendant healthcare providers are required to submit bills for covered services to the QHP insurers for reimbursement.  Reimbursement is based upon the contractually negotiated rate which, in most circumstances, is less than the full charge actually billed for the service provided by the healthcare provider.

64.     Once the insurers have paid the provider for the service, the insurers have a right of subrogation against any third party liability insurance carriers or other "health insurers" as set forth in the respective provider agreements.

65.     Nothing in the applicable statutes, the provider agreements or the provider manuals permit healthcare providers such as Defendants or their collection agents acting on their behalf to circumvent this process and seek a claim for reimbursement directly from the patients.

66.     In fact, Defendant healthcare providers, as well as their subsidiaries and affiliates, have each entered into provider agreements with Blue Cross Blue Shield, Ambetter, QualChoice, and United Healthcare in which each of these Defendants have specifically agreed to accept payment from the insurer as payment in full for a covered

service, and to make no additional charges to the insured or accept any additional payment from the insured except co-pay or deductible amounts.

67.     Plaintiff and Class Members are intended third party beneficiaries of the Provider Agreements and are the intended and protected beneficiaries of the regulatory scheme under the ACA authorizing these contracts.  In fact, it is well known that one of the benefits provided through medical plans is the negotiated rates for covered services offered through the network, thus reducing the insured's out-of-pocket expense.

68.     Thus, to ensure this statutory scheme is followed, and to prevent healthcare providers from billing charges to covered patients for charges in excess of that to which they would be entitled to receive from the insurers, providers are required to submit all bills to the insurers for payment, and then assign to the insurers their right to payment or reimbursement from third party sources so that the insurers can recover their payment through subrogation.

69.     The only possible reason the Defendants would desire to circumvent the required billing process is to avoid the negotiated contracted rates the Defendant healthcare providers agreed to accept from the insurers for the services provided to insured patients such as the Plaintiff and, rather than accepting the negotiated contract rate, seeking to recover the full amount for the charged service from the patient by filing a lien on the patient's claim against the third party and his/her liability insurance carrier.

70.     A lien filed by RevClaims, Avectus, and Defendants herein, such as the one filed against Sue Garrison, is a bill to receive payment from an insured person for services for which payment is payable by the health insurer. *See West v. Shelby County*

16

*Helathcare Corp.*, No. 2012-00044-COA-R3-CV, 2013 WL500777 (Tenn. Ct. App. February 11, 2013).

71.     A lien filed by RevClaims, Avectus, and Defendants herein, such as the one filed against Sue Garrison, is a claim created by application of Arkansas statute, Ark. Code Ann. § 18-46-101, *et. seq.* This statutory framework gives rise to a lien "for the value of the service rendered and to be rendered by the practitioner, nurse, hospital, or ambulance service provided to a patient . . . for the relief and cure of an injury suffered through the fault or neglect of someone other than the patient . . . on any claim, right of action, and money to which the patient is entitled because of that injury . . . " Ark. Code Ann. § 18-46-104. Thus, the statute creates a lien against the patient and the patient's cause of action. The lien, therefore, is not an effort to pursue payment from a third party, but rather an effort to recover directly from the insured patient and by impairing the insured's rights. The Tennessee lien statute under which Avectus files liens on The Med's behalf contains substantially identical provisions.

72.     RevClaims' and Avectus' collections practices with respect to QHP-insured patients constitute a policy and practice by RevClaims and Avectus and the providers whom they represent to disregard applicable Arkansas and Federal law with respect to billing QHP-insured patients for covered services provided to them.

73.     Instead, RevClaims, Avectus, and Defendants herein, in circumstances involving victims of motor vehicle collisions for which payment from a third party liability carrier is apparent, insist upon filing statutory liens against the QHP-insured individuals in order to recover the "standard"—or inflated—amounts for the charged

17

services, which greatly exceed the negotiated rates the Defendant healthcare providers
have agreed to accept from the respective QHP insurers.

74.     As set forth below, this policy and practice by RevClaims, Avectus, and
Defendants herein not only violates the Arkansas and Federal statutes, but constitutes
numerous violations of Arkansas law.

## CLASS ACTION ALLEGATIONS

75.     Pursuant to Ark. R. Civ. P. 23, Plaintiff brings this lawsuit as a class action
on behalf of herself and all others similarly situated.  This action satisfies the Ark. R. Civ.
P. 23(a) requirements of numerosity, commonality, typicality, and adequacy of
representation, and the Rule 23(b) requirements of predominance and superiority.

76.     The proposed class which Plaintiff seeks to represent is defined as follows:

a.      All persons who were insured under an Arkansas QHP and
received covered services from Defendant healthcare providers herein for
injuries sustained in an incident for which a third party was potentially
liable whose subsequent claim against that third party was impaired by the
filing of a lien by Defendants for a charge for services in an amount in
excess of the negotiated contract rate with the QHP insurer.

b.      All persons who were insured under an Arkansas QHP and
received covered services from the Defendant healthcare providers herein
for injuries sustained in an incident for which first-party insurance proceeds
for Personal Injury Protection benefits, med-pay benefits, underinsurance
benefits, uninsurance benefits, or the like, whose claim for those benefits

18

was impaired by the filing of a lien by Defendants for an amount in excess
of the negotiated contract rate with the QHP insurer.

    c.      All persons who were insured by a QHP and received covered
services from Defendant healthcare providers for injuries sustained in an
incident for which a third party was potentially liable who were forced to
pay, had paid on their behalf, or are being asked to make payment for
charges for medical care and services in an amount that violates Defendant
healthcare providers' admission Assignment Agreements and/or exceeds
the co-payment, co-insurance, and/or deductible obligation for said persons
and/or the terms of the Provider Agreements to treat and bill such persons
pursuant to the terms of such agreement.

    d.      All persons who were insured by an Arkansas QHP and
received covered services from Defendant healthcare providers for injuries
sustained in an incident who did not receive the benefit of collection by
Defendants as an Attorney-In-Fact for medical services from a source or sources
most favorable to the clients among the sources known to the Defendants acting
as an Attorney-In-Fact;

    e.      All persons who were insured by an Arkansas QHP and
received  covered services from Defendant healthcare providers for injuries
sustained in an incident who were not refunded amounts received by Defendants
in excess of amounts due for medical care and services provided by Defendant
healthcare providers to said persons;

f.      All persons who were insured by an Arkansas QHP and

received covered services from Defendant healthcare providers for injuries

sustained in an incident who were sent collection notices by Defendants that

contained misleading statements of facts and misrepresentations regarding their

accounts with Defendant healthcare providers.

77.     Excluded from the class are:

a.      All persons who received no monies from any third party

against whom their liability claims were pursued, either through settlement,

judgment, or otherwise;

b.      All persons whose bills subject to liens by Defendant

healthcare providers were ultimately paid in fact by an Blue Cross Blue

Shield, Ambetter, QualChoice/ QCA, and United Healthcare;

c.      All persons who were only billed by Defendant healthcare

providers and/or RevClaims or Avectus for a deductible, coinsurance, or

co-payment as permitted by the insurer's Provider Agreements and

Manuals;

d.      All persons whose health insurance plans were not approved

QHPs or were grandfathered in under the grandfather provision of the

ACA;

e.      All persons with QHPs fully subsidized by traditional

Arkansas Medicaid as identified Class Members in *Lacey Robinett v.*

*Shelby County Healthcare Corporation, et al.,* No. 3:16-cv-00188 (E.D.

Ark. 2016) and *Tammy Hargett v. RevClaims, LLC, et al.*, No. 3:16-cv-00200 (E.D. Ark. 2016) incorporated by reference herein.

      f.      RevClaims, Avectus, St. Bernard's, CrossRidge, Baptist, Lawrence Memorial, White River Health Systems, Inc. and its affiliates, officers, directors, agents, and employees;

      g.      Members of the judiciary and their staff to whom this action is assigned; and

      h.      Plaintiff's counsel.

78.      The members of this class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds, if not thousands, of people geographically dispersed across Arkansas have been damaged by Defendants' actions. The names and addresses of the members of the class are identifiable through records maintained by the Defendants, and Class Members may be notified of the pendency of this action by mail, published, and/or electronic notice.

79.      Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. The questions of law and fact common to the class, include, but are not limited to:

      a.      Whether Arkansas and federal law permit the Defendants to assert liens against QHP-insured individuals, in lieu of submitting bills to the insurers for covered services;

      b.      Whether the Defendants' efforts to enforce statutory liens against QHP-insured individuals' cause(s) of action against third parties constitutes an effort to

bill and receive payment from QHP insureds as prohibited by ACA and the Provider Agreements;

      c.    Whether the Defendants' efforts to enforce statutory liens against the QHP-insured individuals' cause(s) of action against third parties constitutes an effort to recover payment from a QHP insureds in excess of the negotiated rate for services that they have agreed to accept as payment in full from the respective QHP insurer;

      d.    Whether Defendants have been unjustly enriched by their policies and practices by retaining money that should not have been received from the Plaintiff and other Class Members as described herein;

      e.    Whether Defendants have breached their Assignment Agreements with the Class Members by refusing to submit their bills for covered services to the QHP insurers for payment;

      f.    Whether Defendants have converted funds to which QHP-insured individuals are entitled to possess;

      g.    Whether Defendants breached their contracts with Blue Cross Blue Shield, Ambetter, QualChoice, and United Healthcare thus depriving these insurer's insureds of intended contractual benefits;

      h.    Whether Defendants have breached their fiduciary duties owed to Plaintiff and Class Members as their Attorney-In-Fact;

      i.    Whether Defendants conspired to violate Arkansas law and impair QHP insureds' legal rights through their practice and policy of enforcing statutory liens

against QHP insureds for covered services in lieu of submitting bills for these services to the QHP insurers; and

        j.      Whether Plaintiff or other Class Members have been damaged by the Defendants' breaches, as alleged herein and, if so:

               1.      What is the nature and extent of those damages; and

               2.      What relief should be awarded to Plaintiff and other Class Members.

80.      Plaintiff's claims are typical of the claims of all Class Members, as they are all similarly affected by Defendants' custom and practice of unlawful and unjust conduct, and their claims are based on such conduct. Further, Plaintiff's claims are typical of the claims of all Class Members because her claims arise from the same underlying facts and are based on the same factual and legal theories. Plaintiff is no different in any material respect from any other member of the class.

81.      Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Plaintiff's interests do not conflict with the interest of the class she seeks to represent. Plaintiff has retained counsel who are competent and experienced in class action litigation, as well as including insurance and healthcare-related cases. Plaintiff and her counsel will prosecute this action vigorously.

82.      The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all Class Members in one action is impracticable and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each

claim. For many, if not most Class Members, the class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if Class Members had the resources to pursue individual litigation, that method would be unduly burdensome to the Courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the Court system. Moreover, individual litigation could result in inconsistent adjudications of common issues of law and fact.

83.     In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigation parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of the Plaintiff and Class Members. These benefits would result from the comprehensive and efficient supervision of the litigation by a single Court.

84.     Class certification is further warranted because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief for corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I – BREACH OF CONTRACT

85.     Paragraphs 1-84 are incorporated herein by reference as set forth word for word.

86.     Upon admission to St. Bernard's, and as a condition of her admission to St. Bernard's, Sue Garrison assigned St. Bernard's all rights belonging to her as Blue Cross Blue Shield insured. This included an assignment of benefits authorizing St. Bernard's to bill Blue Cross Blue Shield directly and to receive direct reimbursement from Blue Cross

Blue Shield for medical services provided to Ms. Garrison.  *See* Exhibit 3 ("Assignment Agreement").

87.     The Assignment Agreement attached hereto as Exhibit 3 assigns to St. Bernard's all of Sue Garrison's rights to payment for medical bills as a Blue Cross Blue Shield insured.

88.     As a QHP insured, Arkansas and Federal law, as well as the provider agreement between the provider and insurer, prohibit medical care providers such as St. Bernard's and the Defendant healthcare providers from billing Plaintiff and Class Members directly for bills which are covered services under the negotiated provider contract rates.  This statutory condition was accepted by St. Bernard's when it accepted Sue Garrison's assignment of rights under the Assignment Agreement.

89.     Likewise, Arkansas and Federal law prohibit medical care providers such as the Defendant healthcare providers from billing QHP-insureds in excess of the negotiated provider contract rates.  This condition was accepted by St. Bernard's when it accepted Sue Garrison's assignment of rights under the Assignment Agreement.

90.     Rather than adhering to its contractual responsibility to bill Blue Cross Blue Shield for the treatment provided to Sue Garrison, St. Bernard's contracted with RevClaims to directly bill and collect from its patients amounts which exceeded the negotiated contract rates.  St. Bernard's, therefore, in concert with agent RevClaims, breached its contract with Sue Garrison by opting to collect from Sue Garrison directly a sum of money that substantially exceeded the negotiated contract rate for the services received.

91.     All other Defendant healthcare providers require patients to execute nearly identical assignment agreements upon admission, and all Defendant healthcare providers likewise contract with either RevClaims or Avectus to directly bill and collect from their patients amounts which exceed the negotiated QHP contract rates.

92.     St. Bernard's and Sue Garrison have a valid and enforceable contract under the Assignment Agreement.

93.     The contract assigned to St. Bernard's all rights belonging to Sue Garrison as a Blue Cross Blue Shield insured.  Sue Garrison's status as a Blue Cross Blue Shield insured not only authorizes payment for all covered services by Blue Cross Blue Shield, but prohibits healthcare providers in the network from billing its insureds such as Sue Garrison for these services.

94.     Sue Garrison did what the contract required of her by assigning her Blue Cross Blue Shield rights to St. Bernard's and by providing St. Bernard's all information needed to submit her bills to Blue Cross Blue Shield.

95.     St. Bernard's did not do what the contract required of it by refusing to bill Blue Cross Blue Shield and instead, through its agent RevClaims, billed Sue Garrison directly for the inflated charges for these services which greatly exceeded the negotiated contract rates.  Defendants' actions constitute a breach of contract, resulting in financial harm to Sue Garrison and other Class Members as outlined herein.

96.     All other Defendant healthcare providers require patients to execute nearly identical assignments upon admission, and all Defendant healthcare providers likewise

26

contract with either RevClaims or Avectus to directly bill and collect from their patients amounts which exceed the negotiated contract rates.

97.    The Defendants breached the contracts created by the Assignment Agreements with Sue Garrison and the Class Members and have caused the Plaintiff and other Class Members damages as a result.

98.    In addition, in the performance of contractual obligations, Arkansas law implies a promise between the parties that they will act in good faith and deal fairly in performing and enforcing their obligations under the contract. Stated another way, the law implies a promise between the parties that they will not do anything to prevent, hinder, or delay the performance of the contract.

99.    In breaching their contracts with Arkansas QHP insureds, Defendants, through their agents RevClaims and Avectus, have taken affirmative actions to prevent, hinder, and delay the performance of their contracts with Ms. Garrison and the Class Members. Such actions are additional evidence of Defendants' breach of the contract.

100.    As a result of the Defendants' unlawful breach of contract, the Plaintiff and the Class Members have been damaged for an amount more fully set forth below and for which the Defendants are jointly and severally liable.

## COUNT II – BREACH OF CONTRACT AS THIRD PARTY BENEFICIARY

101.    Paragraphs 1-100 are incorporated herein by reference as set forth word for word.

102.    Defendants, including their subsidiaries and affiliates, entered into Provider Agreement contracts with Blue Cross Blue Shield, Ambetter, QualChoice, and United

Healthcare. *See e.g.*, Exhibits 7-9. The terms of these contracts require that Defendants comply with all billing rules and regulations as outlined in the applicable provider manuals, Arkansas statutes, and other laws implementing the ACA in the State of Arkansas.

103.    The contracts clearly are intended to benefit insureds such as Plaintiff and other Class Members under the terms of the contract.

104.    The contracts required Defendants to bill all covered services for insured individuals such as Plaintiff and other Class Members to the respective insurer for payment in lieu of billing the patient directly for its charges or billing any charges in excess of the negotiated contract rate between Defendants and the insurers for these services.

105.    Plaintiff and the Class Members did what the contracts required of them by assigning all rights belonging to them as insured individuals to Defendants in exchange for Defendants providing services to them.

106.    Defendants, acting through their agent RevClaims and/or Avectus, did not do what the contracts required of them by, instead of sending their bills for services provided to the patient's insurer for payment, filing a lien which encumbered Plaintiff's and the Class Members' third party liability claims and ultimately acted as a bill directly sent to them for services provided to them in an amount in excess of that which was agreed upon between Defendants and the insurers for these covered services.

107.   Defendants, in contracting with RevClaims and Avectus to perform their bill collection against Plaintiff and Class Members, assigned their contractual rights and responsibilities under their Provider Agreements to RevClaims and Avectus, respectively.

108.   As such, Defendants have breached the Provider Agreements and have caused the Plaintiff and other Class Members damages as a result.

109.   In addition, in the performance of contractual obligations, Arkansas law implies a promise between the parties that they will act in good faith and deal fairly in performing and enforcing their obligations under the contract.  Stated another way, the law implies a promise between the parties that they will not do anything to prevent, hinder, or delay the performance of the contract.

110.   In breaching their contracts with Arkansas QHP insurers, Defendants, through their agents RevClaims and Avectus, have taken affirmative actions to prevent, hinder, and delay the performance of their contracts to the detriment of third party beneficiaries such as Plaintiff and the Class Members.  Such actions are additional evidence of Defendants' breach of the contract.

111.   As a result of the Defendants' unlawful breach of contract, the Plaintiff and the Class Members, as third party beneficiaries, have been damaged for an amount more fully set forth below and for which the Defendants are jointly and severally liable.

## COUNT III - VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT

112.   Paragraphs 1-111 are incorporated herein by reference as set forth word for word.

113.   Plaintiff and Class Members are "persons" entitled to protection under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et. seq.*

114.   Defendants, through their agents and employees, have engaged in unconscionable and false deceptive acts and practices of business as described above. Despite being aware that Plaintiff and Class Members are QHP-insured individuals, the Defendants have refused to submit their bills for services provided to the QHP insurers for payment, instead insisting upon filing a lien encumbering the Plaintiff's and Class Members' cause(s) of action against third party(-ies) in order to recover a fee in excess of the negotiated contract rate which Defendants agreed to receive from the QHP insurers.

115.   Defendants, through their agents and employees, have engaged in unconscionable and false deceptive acts and practices of business as described above. Despite being aware that Plaintiff is a QHP-insured individual, the Defendants have refused to submit their bills for services provided to the QHP insurer for payment, instead insisting upon filing a lien encumbering the Plaintiff's and Class Members' cause(s) of action against third party(-ies) in order to recover a fee from a QHP insured directly.

116.   Defendants knowingly engaged in a scheme and artifice to defraud the Plaintiff and Class Members, made untrue statements of facts, omitted to state material facts necessary in order to make previous factual statements, in light of the circumstances in which they were made, not misleading, and engaged in acts and practices in courses of business which operated as a fraud and deceit upon the Plaintiff and Class Members. The actions are unconscionable, false, and deceptive in the practice of business and, thus, they are in violation of Ark. Code Ann. § 4-88-107.

30

117.   Defendants' conduct proximately caused Plaintiff and Class Members to suffer damages as set forth herein, as well as reasonable attorney's fees and costs of litigation pursuant to Ark. Code Ann. § 4-88-113(f).

118.   The improper actions of the Defendants have caused the Plaintiff and Class Members to suffer damages in excess of that required for federal diversity jurisdiction.

## COUNT IV - UNJUST ENRICHMENT

119.   Paragraphs 1-118 are incorporated herein by reference as set forth word for word.

120.   Defendants' conduct, as described above and as more specifically alleged in this count, also constitutes unjust enrichment, for which Plaintiff and other Class Members are entitled to pursue equitable remedies in accordance with Arkansas law.

121.   Defendants have encumbered all funds from the Plaintiff and other Class Members for services which should have been billed to Arkansas QHP insurers and for which Defendants should have accepted the negotiated contract rate from these insurers. In improperly enforcing their statutory lien against Plaintiff and other Class Members' cause(s) of action against liable third parties, the Defendants received payment in excess of that to which they were legally entitled as a result of their provider agreements.

122.   Defendants' actions were unjust and inequitable in that they received far more than that which they were entitled to receive for their services as required by their contracts with the Arkansas QHP insurers, the Provider Manuals, and Arkansas and federal statutes and regulations.

123.   Defendants' actions were unjust and inequitable in that they failed to disclose to Plaintiff and other Class Members that they were required to bill Arkansas QHP insurers for the discounted rate for the services provided to these QHP insureds for these covered services.

124.   Defendants' actions were unjust and inequitable in that Defendants concealed from Plaintiff and other Class Members that they were receiving more than they were legally permitted to receive by enforcing their statutory lien instead of billing the QHP insurers for the services.

125.   Defendants' actions were unjust and inequitable in that Defendants concealed from Plaintiff and other Class Members that they were not permitted to bill QHP insured directly for Defendants' covered services.

126.   Defendants' actions were unjust and inequitable and the Defendants owed a fiduciary duty to, and/or had a special relationship with, Plaintiff and other Class Members.

127.   As a result of Defendants' unjust and inequitable actions, Defendants were unjustly enriched by receiving something of value to which they were not entitled.  More specifically, Defendants retained, and had the beneficial use of, money that Plaintiff and other Class Members were entitled and should have received in payment of their third party claims.

128.   As a result of their unjust and inequitable actions, Defendants were unjustly enriched by receiving money under such circumstances that, in equity and good conscious, they ought not retained.

32

129.    In light of the foregoing, Plaintiff and other Class Members are entitled to restitution and other equitable relief.

## COUNT V - CONVERSION

130.    Paragraphs 1-129 are incorporated herein by reference as set forth word for word.

131.    Plaintiff and Class Members were entitled to receive and possess funds from third parties, including third party liability carriers, resulting from liability claims arising from incidents in which the Plaintiff and Class Members suffered personal injury as a result.

132.    The Defendants intentionally took and exercised dominion and control over the funds to which the Plaintiff and Class Members were entitled to recover in violation of the Plaintiff's and Class Members' rights.

133.    The Defendants' actions as described above constitutes a conversion of the funds to which the Plaintiff and Class Members were entitled to recover and possess.

134.    As a result of the Defendants' unlawful conversion of Plaintiff's funds, the Plaintiff and Class Members have been damaged in an amount more fully set forth below and for which the Defendants are jointly and severally liable.

## COUNT VI – BREACH OF FIDUCIARY DUTY

135.    Paragraphs 1-134 are incorporated herein by referenced as set forth word for word.

136.    As a result of the relationship between Plaintiff, the Class Members, and Defendant healthcare providers, including Defendant healthcare providers' role as

Attorney-In-Fact as the assignee of Plaintiff's QHP rights under the Assignment Agreements, a fiduciary relationship exists between the Plaintiff, the Class Members, and Defendant healthcare providers.

137.    Defendants RevClaims and Avectus knew, or should have known, of the fiduciary duties between Defendant healthcare providers and the Plaintiff and agreed to act as an agent of Defendant healthcare providers.  Defendants RevClaims and Avectus undertook performance of these collection duties as agents of Defendant healthcare providers, thereby knowingly assuming an obligation of proper performance of such duties of its principals.

138.    Among the fiduciary duties owed by Defendants to Plaintiff and members of the Class is the duty to act on Plaintiff's behalf and in Plaintiff's best interests in seeking payment from available sources from the QHP insurers which was available to Plaintiff and members of the Class.

139.    Defendants breached their fiduciary duties by, among other things, communicating false information to the Plaintiff and Class Members regarding the amount of charges owed for medical care and services provided by Defendant healthcare providers, wrongfully, deceptively, and improperly charging Plaintiff and Class Members for medical care and treatment that greatly exceeded the negotiated contract rates, failing to refund amounts received in excess of the amounts allowed pursuant to the respective Provider Agreements, pursuing collection policies and practices which put the Defendants' financial interests ahead of the Plaintiff's and those of the Class Members', failing to pursue collection from sources favorable to Plaintiff and Class Members, and

altering and modifying their billing and charges to enable collection from sources more favorable to Defendant healthcare providers but less favorable to the Plaintiff and Class Members than otherwise were available.

140.  The Defendants breached their fiduciary duties owed to the Plaintiff and Class Members in a manner that sought to benefit the Defendants and did, in fact, benefit Defendants.

141.  The Defendants' breach of fiduciary duties owed to the Plaintiff and Class Members proximately caused damages to the Plaintiff and Class Members as more fully set forth herein.

## COUNT VII – ABUSE OF PROCESS

142.  Paragraphs 1-141 are incorporated herein by referenced as set forth word for word.

143.  By refusing to send their bills for services provided to the QHP insurers for payment and instead filing liens which encumbered the Plaintiff's and Class Members' claims and ultimately acted as a bill sent directly to them for services provided to them in an amount in excess of that which was agreed upon between Defendants and the respective insurers for these covered services, the Defendants have set in motion legal procedures against the Plaintiff and Class Members.

144.  The liens filed by RevClaims and Avectus on behalf of the Defendant healthcare providers constitute "judicial process" as that term is defined under Arkansas law.

145.   In filing liens for unsubstantiated and meritless amounts against the Plaintiff and Class Members in their claims, the Defendants intended to pervert the legal procedure to accomplish their true alternative purpose of extorting and coercing the Plaintiff and Class Members to pay money to them even though they had no right to seek such payment.

146.   The filing of unsubstantiated and meritless liens against the Plaintiff and Class Members in order to extort and coerce these payments constitutes a willful act perpetrated in the use of process which is not proper in the regular conduct of a legal proceeding.

147.   As a result of the Defendants' abuse of process, the Plaintiff and Class Members have suffered damages as more fully set forth below.

### COUNT VIII - CIVIL CONSPIRACY

148.   Paragraphs 1-147 are incorporated herein by reference as set forth word for word.

149.   Defendants entered into an agreement whereby they conspired to illegally and improperly enforce statutory liens in order to recover amounts in excess of the negotiated contract rates directly from QHP insured individuals in lieu of submitting the bills to the QHP insurers for payment.

150.   The Defendants concealed material aspects of their scheme and agreement from the Plaintiff and other class members.

151.   The agreement between the Defendants constitutes a civil conspiracy under Arkansas law and was conducted for the purpose of illegally, improperly, deceptively,

and fraudulently collecting amounts in excess of that to which they had agreed to receive for covered services provided to QHP insured individuals directly from their patients in lieu of submitting the bills to the QHP insurers.

152.    Defendants engaged in acts which were improper and conducted in furtherance of a civil conspiracy to illegally and improperly to obtain monies from the Plaintiff and the Class Members.

153.    The agreement between the Defendants was unlawful and carried out for an unlawful purpose resulting in direct monetary damage to the Plaintiff and the Class Members.

154.    The agreement/conspiracy and the actions taken by the Defendants in carrying out the unlawful purpose of the conspiracy were conducted maliciously, willfully, and wantonly for the purpose of intentionally harming the Plaintiff and the Class Members.

155.    As a result of the improper actions of the Defendants, the Plaintiff and the Class Members have been financially harmed in an amount for which the Defendants are jointly and severally liable.

## COUNT IX - ACTING IN CONCERT

156.    Paragraphs 1-155 are incorporated herein by reference as set forth word for word.

157.    The Defendants entered into a conscious agreement whereby they conspired to illegally and improperly enforce statutory liens against Plaintiffs and other Class Members' third party causes of action in order to recover directly from the Plaintiff and

37

other Class Members' amounts in excess of that to which the Defendants would be entitled to receive by sending the bill for services to the QHP insurers.

158.   The Defendants entered into a conscious agreement to pursue a common plan or design to illegally, improperly, deceptively, and fraudulently enforce statutory liens against Plaintiffs and other Class Members' third party causes of action in order to recover directly from the Plaintiff and other Class Members' amounts in excess of that to which the Defendants would be entitled to receive by sending the bill for services to the QHP insurers.  The actions taken in furtherance of this common plan and design were in violation of the Arkansas Deceptive Trade Practices Act.  These actions also constitute conversion, breach of fiduciary duty, abuse of process, and justify relief under the doctrine of unjust enrichment.

159.   Defendants have entered into an agreement to improperly and illegally collect bills directly from its patients who are QHP insured individuals for amounts in excess of that to which the Defendants had agreed to accept from the QHP insurers.

160.   The Defendants acted in concert and each actively took part in the conscious agreement to pursue a common plan and design and engaged in acts which were improper and conducted in the furtherance of this common plan and design to illegally and improperly recover money directly from the Plaintiff and Class Members in excess of that to which it could recover from the QHP insurers.

161.   The conscious agreement to pursue a common plan and design entered into between the Defendants was unlawful and carried out for an unlawful purpose resulting in direct monetary damage to the Plaintiff and the Class Members.

38

162.    The conscious agreement to pursue a common plan and design entered into between the Defendants and the actions taken by the Defendants in carrying out the unlawful purpose of the common plan and design were conducted maliciously, willfully, and wantonly for the purpose of intentionally harming Plaintiff.

163.    As a result of the improper actions of the Defendants, Plaintiff and Class Members have been harmed an amount for which the Defendants are jointly and severally liable.

## COUNT X – VIOLATIONS OF THE ARKANSAS FAIR DEBT COLLECTION PRACTICES ACT (REVCLAIMS AND AVECTUS)

164.    Paragraphs 1-163 are incorporated herein by reference as set forth word for word.

165.    Plaintiff and Class Members are "consumers" as that term is defined in Ark. Code Ann. § 17-24-502(2).

166.    Defendants RevClaims and Avectus are "debt collectors" as that term is defined in Ark. Code Ann. § 17-24-502(5)(A).

167.    In filing liens throughout the State of Arkansas on invalid debts for inflated amounts in order to collect directly from Defendant healthcare providers' patients amounts which far exceed the negotiated contract rates, along with mailing correspondence to these patients indicating that these liens could be resolved by payment of a "negotiated" fee, RevClaims and Avectus have used false, deceptive and misleading representations and means in connection with the collection of an alleged debt in violation of Ark. Code Ann. § 17-24-506(a).

39

168.    In addition, as explained more fully above, RevClaims and Avectus have falsely represented the character, amount, and legal status of this non-existent debt in violation of Ark. Code Ann. § 17-24-506(2)(A).

169.    In addition, as explained more fully above, RevClaims and Avectus have falsely threatened to take legal action that they cannot legally take, have taken legal action that they cannot legally take, and have threatened and taken legal action that was not intended to be taken in connection with the collection of the non-existent patient debt in violation of Ark. Code Ann. § 17-24-506(5).

170.    As explained more fully above, RevClaims and Avectus have employed unfair and unconscionable means to attempt to collect non-existent debt.

171.    As a result of the above violations, Plaintiff and Class Members are entitled to recover actual damage incurred, including any amounts paid to Defendants for these liens, as well as any fees or expenses associated with the resolution and release of any liens filed throughout the State of Arkansas.

172.    In addition, Plaintiff and Class Members are entitled to a statutory penalty not to exceed $1,000 per violation in accordance with Ark. Code Ann. § 17-24-512(a)(2).

173.    Plaintiff demands a trial by jury on all issues.

WHEREFORE, Plaintiff Sue Garrison, Individually and On Behalf of Other Similar Situated, request that the Court grant the following relief:

a.      Certify that this lawsuit may be prosecuted as a class action pursuant to Rule 23 of the Arkansas Rules of Civil Procedure;

b.      Appoint Plaintiff and Plaintiff's counsel to represent the class;

40

c.     Declare that the Defendants have violated the Arkansas Deceptive Trade Practices Act;

d.     Declare that the Defendants have been unjustly enriched as a result of their wrongful conduct;

e.     Declare that the Defendants have improperly converted funds belonging to the Plaintiff and the Class;

f.     Declare that the Defendants have abused the legal process in Arkansas;

g.     Declare that the Defendants have engaged in a civil conspiracy and acted in concert in committing the actions above;

h.     Award the Class damages in an amount equal to all amounts improperly billed to the Class and recovered through filing liens;

i.     Award the Class pre-judgment and post-judgment interest;

j.     Enjoin the Defendants from engaging in the unlawful and unjust conduct complained of herein;

k.     Award the Class reasonable attorney's fees and costs; and

l.     Award the Class any and all other additional relief to which the Plaintiff and other Class Members may be entitled.

Respectfully Submitted,

Brandon W. Lacy #03098
WILCOX & LACY, PLC
600 S. Main Street
Jonesboro, Arkansas 72401
870-931-3101

-and-

41

Jeffery O. Scriber, #2006526
JEFF SCRIBER, P.A.
324 S. Main Street
Jonesboro, AR 72401
870-336-0155

Attorneys for Plaintiff

By: _____
Brandon W. Lacy #03098

42